IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| Matthew Martorello, Rebeca L. Martorello, and the RLM 2018 Family Trust, *et al*; <br><br> Plaintiffs <br><br> v. <br><br> The Summit Investment Group, LLC, Michael C. Basile, his wife Jane Doe and the partnership comprised by them, John Doe, *et al*; <br><br> Defendants | Civil Action No. 22-1602 <br><br><br> Declaratory Judgment; <br> Violations of the Puerto Rico Uniform Securities Act; <br> Breach of Contract; <br> Punitive Damages |

**Complaint for Violations of the Puerto Rico Securities and Contract Laws**

**TO THE HONORABLE COURT:**

**COME NOW** plaintiffs Matthew Martorello, Rebecca L. Martorello, and the RLM 2018 Family Trust (collectively the "Plaintiffs" or "Martorellos"), through the undersigned attorney, and very respectfully state, allege and pray as follows:

**Nature of Complaint**

1.  This action stems from (a) the illegal offer and sale of securities by The Summit Investment Group, LLC ("Summit") and co-defendant Michael C. Basile ("Mr. Basile" or "Basile") *without having the necessary authority under Puerto Rico law to execute said transactions as broker-dealers* and (b) the gross misrepresentations or omissions of material facts by the Defendants, which led the Martorellos to enter into transactions (to the tune of $4,000,000) that otherwise they would have declined.

2.  Under the Puerto Rico Uniform Securities Act ("PRUSA"), 10 PR Laws Ann.

§851, *et seq.*, it is *illegal* for any person to offer or enter into investment transactions, such as the transactions effected between Summit and the Martorellos, without being licensed as a broker-dealer or agent. 10 PR Laws Ann. § 861. As an agent of Summit, Mr. Basile is equally forbidden from facilitating or participating in such transactions and, as such, he is jointly and personally liable.

### The Parties

3.   Matthew Martorello is of legal age, married and a resident of Dallas, Texas. Mr. Martorello's domicile is in 3805 Greenbrier Dr., Dallas, Texas 75225.

4.   Rebecca L. Martorello is of legal age, married to Mr. Martorello and a resident of Dallas, Texas. Ms. Martorello's domicile is in 3805 Greenbrier Dr., Dallas, Texas 75225.

5.   The RLM 2018 Family Trust (the "RLM Trust) is a trust organized under the laws of Texas and its principal place of business is in 3805 Greenbrier Dr., Dallas, Texas 75225. Mr. Martorello serves as the Trust's trustee and is also appearing on behalf of the Trust in this action.

6.   The Summit Investment Group, LLC, is a limited liability corporation organized under the laws of Puerto Rico. Upon information and belief, Summit is a single member LLC, wholly owned by Mr. Basile. Summit's principal place of business is in Puerto Rico. According to the Puerto Rico Department of State records, its business and mailing addresses is Urb. Costa de Oro #81, Suite 203, Dorado, PR 00646.

7.   Michael C. Basile is of legal age, married to Jane Doe and a citizen of Puerto Rico. Mr. Basile's domicile is in Dorado, Puerto Rico. His physical address is 3207

Plantation Village, Dorado, Puerto Rico 00646.

8.   Jane Doe is of legal age, married to Mr. Basile and together they form, upon information and belief, a conjugal partnership or community property, which is legally responsible for the damages caused by Mr. Basile's conduct.

9.   John Doe, who is included as a fictious defendant that cannot be readily identified at the time of this lawsuit, is an executive(s) of Summit who actively participated in the scheme to have the Martorellos invest in an entity whose financial position and operation was far worse than that represented to the investors in the investment decks tendered to them to entice them to make their decision.

**Jurisdiction and Venue**

10. The Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1), since plaintiffs and defendants are citizens of different States and the amount in controversy exceeds $75,000.

11. Venue lies in this Court pursuant to 28 U.S.C. § 1391(a)(c) since defendants are subject to the personal jurisdiction of this Court and a substantial part of the events giving rise to the claims took place in Puerto Rico. Moreover, Defendants are found in Puerto Rico, transact business here and a significant part of the transactions and acts or omissions constituting the violations/offenses described herein occurred in Puerto Rico.

**Facts Common to All Claims**

12. On November 26, 2021, each of the co-plaintiffs separately entered into three agreements with Summit for the acquisition, through Summit, of certain

"Covered Investments" in stock from an entity called TeraWulf, Inc. (the "Investment Agreements"). <u>See</u> **Exhibit 1**, whose terms are incorporated by reference herein and included as part of the allegations in support of the Complaint.[1]

13. Exhibit A to the Investment Agreements further describes the "Covered Investments" which Defendants were offering and selling as follows:

EXHIBIT A

Covered Investments

Covered Investments under this Agreement are set forth below:

Company's $1,250,000.00 Investment in Terawulf Inc.'s private equity, an issuance by "WULF" of unregistered common stock through a 4a(2) private exemption under the Securities Act of 1933 at $16.72 a share.  The issuance is likely to occur immediately post-closing of WULF's reverse merger with Ikonix ("IKNX") as contemplated within the Form S-4 filed on July 30, 2021 with and approved since by the SEC by "Telluride Holdco, Inc.".  The parties anticipate IKNX shareholder vote on December 10th and closing and issuance on December 13th, but may be subject to unforeseen delay.

14. As compensation for its services as an intermediary, Summit charged the Martorellos a transaction-based fee or 20% commission.

15. Exhibit B to the Investment Agreements describes Summit's compensation as follows:

EXHIBIT B

Compensation

a)  20% Carry fee earned by Summit on all gains above the $16.72 cost basis in this TeraWulf, Inc equity position. This 20% Carry Fee will be calculated from subtracting the $16.72 cost basis of the investment from the opening share price/valuation the day after the IKNX ticker trades as WULF as outlined in the July 30, 2021 S-4.

The carry fee portion of the Fee Arrangement will be paid to Summit the day Summit transfers their remaining investment shares to the Company.

16. In simple terms, Summit heavily courted the Martorellos to offer and sell them, as an intermediary, a "slam dunk" investment in the stock of a third party,

---

[1] We have only included one of the agreements, since their language and terms are identical.

where the "downside risk is priced in." All, in exchange for a 20% commission for its services.

17.  The so-called investments consisted in new shares of TeraWulf's common stock, which were issued through private placement transactions and were restricted securities that could not be immediately circulated to the public.

18. TeraWulf is in the business of owning and operating fully integrated and environmentally clean bitcoin mining facilities in the United States.

19. The capital raised through these equity transactions was expected to enable TeraWulf to significantly increase its already existing mining capacity, to strategically position itself in the mining industry.

20. Summit further enticed and recommended the Martorellos to invest in these securities, which Basile touted as an "overnight double", with a June 2021 investment deck showing a $800 million EBITDA.[2]

21. TeraWulf expected to become a publicly traded company through a business combination with IKONICS Corporation –a Minnesota imaging technology company-- which was listed in Nasdaq as IKNX.

22. TeraWulf's public status and its combination with IKONICS were still in progress when the parties signed the Investment Agreements.

23. As part of the Investment Agreements, Defendants expressly represented to Plaintiffs *that Summit had to authority to enter into and perform the agreement* *and* *that it was fully aware of its responsibility for complying with state securities laws*:

---

[2] EBITDA stands for Earnings before Interest, Taxes, Depreciation and Amortization. It is a term widely used as an indicator of the overall profitability of an ongoing business.

3.     **Representations, Warranties and Covenants**.

(a)     Summit represents that it is a single member LLC.

(b)     Each party represents and warrants to the other that it has the full legal right to enter into and perform this Agreement and that its entry into and performance of this Agreement does not and will not violate any fiduciary or other duty it may have to any other person.

(c)     Each party acknowledges that it is responsible for its own compliance with state and federal securities laws, including the Securities Act of 1933, the Securities Exchange Act of 1934 and all rules promulgated thereunder.

24. Additionally, Summit agreed to an extremely broad indemnification and hold harmless provision in favor of the Martorellos, which even covered "alleged misrepresentations", "alleged omissions", and "alleged breaches", *inter alia.* Due to its importance, we reproduce below the indemnification clause in its entirety:

4. Indemnification. (a) Summit agrees to indemnify and hold harmless the Company, its officers, directors, employees, legal counsel and its affiliates (each, a "Company Indemnified Party") against any and all losses, claims, damages and liabilities, joint or several, and expenses (including all legal or other expenses reasonably incurred by the Company) caused by or arising out of (i) any misrepresentation or untrue statement or alleged misrepresentation or untrue statement of a material fact made by Summit to the Covered Members, or the omission or the alleged omission to state to the Covered Members a material fact necessary in order to make statements made not misleading in light of the circumstances under which they were made (except to the extent such misrepresentations, untrue statements or omissions are based on information provided to Summit by the Company), (ii) any misrepresentation or untrue statement or alleged misrepresentation or untrue statement of a material fact contained in any document furnished to the Covered Members, or the omission or the alleged omission to state in the documents furnished to the Covered Members a material fact necessary in order to make the statements therein not misleading in light of the circumstances under which they were made, to the extent such misstatements or omissions are made in reliance upon and in conformity with written information furnished by Summit for use in the documents 2 furnished to the Covered Members, (iii) any breach or alleged breach of any representation, warranty or covenant made by Summit in this Agreement, or (iv) Summit's bad faith, gross negligence or willful misconduct in performing the services described herein. Summit agrees to reimburse the Company Indemnified Party for any reasonable expense (including reasonable fees and expenses of counsel) incurred as a result of producing documents, presenting testimony or

evidence, or preparing to present testimony or evidence (based upon time expended by the Company Indemnified Party at its then current time charges or if such person shall have no established time charges, then based upon reasonable charges), in connection with any court or administrative proceeding (including any investigation which may be preliminary thereto) arising out of or relating to the performance by the Company Indemnified Party of any obligation hereunder.

25. The parties further agreed that Puerto Rico law would control.  ("Governing Law. This Agreement is governed by the internal substantive laws, but not the choice of law rules, of Puerto Rico.")

**Summit's (and Basile's) Illegal Broker Activity**

26. Defendants' role as intermediaries to securities transactions for a hefty commission is the quintessential example of broker dealer activity.

27. Defendants, in essence, have engaged in the business of effecting transactions in securities on the account of others *without being licensed by the appropriate authorities*: the Office of the Commissioner of Financial Institutions of Puerto Rico ("OCFI") and the Financial Industry Regulatory Authority.

28. At all relevant times, OCFI's and FINRA's records show that neither Summit nor Basile are registered as broker-dealers or agents.

29. Defendants have repeatedly held themselves out as being in the business of effecting transactions for others.

30. The Investment Agreements, for example, contemplate a transaction-based compensation or 20% commission for their services.

31. First Circuit precedent clearly holds that "[t]ransaction-based compensation is a "hallmark" indication that a party has acted as a broker and must register

because it 'represents a potential incentive for abusive sales practices that registration is intended to regulate and prevent.'" *EdgePoint Capital Holdings, LLC v. Apothecare Pharmacy, LLC*, 6 F.4th 50 (1st Cir., 2021).

32. Tellingly, Defendants are not engaging in these transactions to invest for themselves to simply make an arbitrage or spread in a potential resale. Instead, they are serving as conduits to third parties, such as Plaintiffs, to effectuate the transactions in exchange for a considerable commission-like fee.

33. Defendants' conduct is not due to an innocent/isolated event, but rather a *modus operandi* they have repeatedly put in practice, in an open affront to PRUSA's provisions, which require that individuals and entities engaging in broker dealer activity be previously registered and licensed.

34. For example, Defendants have solicited Plaintiffs with other potential investment transactions in connection with the securities of Uber and Top Golf, among others.

35. Upon information and belief, Defendants have also pitched the TeraWulf stock at issue here to other investors/customers.

36. Additionally, after the issuance of the TeraWulf stock to Summit, Defendants brokered a partial resale of the stock purchased by the RLM Trust, *additional* activity for which they had to be licensed but were not.

37. In sum, Defendants have been acting as an unregistered broker or agent in direct violation of PRUSA's express provisions, on more than one occasion.

38. First Circuit caselaw has also interpreted the term "effecting securities" broadly. <u>See</u> *Massachusetts Fin. Servs. Inc., v. Securities Investor Prot. Corp.,* 411

F. Supp 411, 415 (D.Mass.), *aff'd,* 545 F.2d 754 (1st Cir.1976) (holding that a person effects transactions in securities if he or she participates in such transactions "at key points in the chain of distribution").

39. That also holds true here, where Defendants are not simply introducing investors to an investee company and subsequently withdrawing from any further negotiation or sale.

40. Defendants instead were actively participating in key points of the transactions, by soliciting Defendants, negotiating the acquisition price of the stock, which they set at $16.72 per share in this case, and executing the transactions by handling all the delivery hurdles associated with securities that were (in their origin) exempted from registration.[3]

41. Moreover, Defendants (i) provided advice regarding the prospects of the investment in TeraWulf *vis-à-vis* other players in the mining industry, (ii) tendered and highlighted investment information to Defendants about the financial position and operations of TeraWulf; (iii) heavily marketed said investment as at least an "overnight double" with no downside, (iv) boasted about Summit and Basile's own investments in said company and (v) about how Summit and Basile themselves were "involved with the company and getting a special look".

42. By participating in such important parts of the transaction, among other activities, Defendants played a proactive and aggressive role, as opposed to merely acting as a finder between two parties to a transaction involving the

---

[3] The Securities Exchange Commission has repeatedly stated that a person who sells securities that are exempt from registration (including private placements under Regulation D of the 1933 Securities Exchange Act) must nevertheless register as a broker-dealer.

purchase and sale of securities.

**Defendants' material misrepresentations and omissions**

43. Defendants first reached out to Plaintiffs to solicit their investment in TeraWulf in October of 2021 *but were quickly turned down.*

44. Undeterred by this rejection, they sought to improperly entice Plaintiffs with knowingly stale and inaccurate/incomplete information about TeraWulf's deteriorating financial numbers.

45. Upon information and belief, Defendants had first-hand knowledge that the establishment of the mining operation (and thus its revenue and cash flow projections in the June 2021 investment document that they used to solicit Plaintiffs' investment) was grossly misrepresented, as compared to the then present state of affairs.

46. Faced with the prospects of their own diminishing investment in TeraWulf, of which they were overcommitted since June of 2021, Defendants appear to be secretly seeking to unload that position to an unwitting buyer.

47. For example, as an initial $2 million investor in a TeraWulf Series A round, Defendants are likely to have access to information clearly showing that TeraWulf's ability to secure the necessary miners was materially challenged by supply chain issues and chip shortages, among others.

48. Defendants were not detached investors, with little or no information on the current affairs of TeraWulf. They routinely and openly talked about their "buddy", Bryan Pascual, who had built out the mining infrastructure of other successful public mining companies and was now replicating this work with TeraWulf's energy

facilities.

49. Yet, the construction of TeraWulf's energy facilities were far from being a successful story (as Defendants led Plaintiffs to believe) and were, indeed, substantially behind the stale forecasts that Defendants provided the Martorellos.

50. More specifically, after soliciting a second time, on November 21, 2021 Summit's CFO provided Defendants with a *June 2021* investment deck, which materially differed from the forecasts the company was then expecting.

51. Pressed with questions from the Martorellos about the suitability of the investment, Basile communicated "the game is to buy miners and get them online" and "it's simply a function of securing cheap energy and buying miners".

52. Indeed, the progress in those regards was of paramount importance to any investment consideration on November 21, 2021. The June investment deck showed revenue generation before the end of the year and a significant ramp to scale across 2022, which by November 21 was no longer in the cards.

53. In fact, there would be no 2021 revenue at all, as the June 2021 investment deck suggested.

54. The company would not begin trickling in revenue until April of 2022, and the then overwhelmingly truncated projections for "get[ting] miners online" thereafter (as a result of the supply chain delays and chip shortages) completely devastated the investment.

55. Thereafter, Mr. Martorello began to realize "the power/miner/revenue plan was bogus", as he communicated to Basile once it was too late. Basile's sentiments in response were that "it's just a matter of time or if we're willing to

stomach this downturn"; a material fact that the Martorellos should have been permitted to consider *prior to* Defendants taking their money for a transaction they described more than once as "slam dunk", "overnight double" investment with the "downside risk […] priced in."

56. All in all, Defendants were fully aware that they pitched an investment deck that was completely bunk as of November 26, 2021. As Mr. Martorello stated to Basile, the Martorellos "w[ere] sold on a deck with 800mm EBITDA. Not 300mm of revenue on the same [level of power]."

57. Moreover, Defendants incorrectly represented that global financial services firms specializing in institutional trading, such as BTIG, would be covering the stock, and that the stock would be trading options.

58. Defendants also failed to inform the Martorellos that there was a $123.5 million debt round that was apparently closing alongside the TeraWulf private placement deal.

59. Defendants also incorrectly represented that the "CVR" or value of the liquidation of assets from the IKONICS reverse merger had $0 value in the share price.

60. To add insult to injury, Plaintiffs agreed to buy their shares at $16.72, as advertised for a private placement valuation of $1.75billion, but post-closing the numbers provided by Defendants were completely off. Defendants claimed that the locked-in price of Plaintiffs' stock was significantly higher than $16.72, when the plain language of the contracts showed otherwise.

61. By increasing the price per share, Defendants effectively tried by omission

(or otherwise) to deprive Plaintiffs from owning thousands of additional shares to which they were totally entitled.

62. Also, while Mr. Martorello questioned if the shares could be sold once the deal closed, Basile stated "volume won't be a problem" and even admitted that Defendants themselves "could have managed [a $2 million investment] size without liquidity issues".

63. Yet, despite such bold statements, Summit kept Defendants' positions of $4 million, so that *their* exits would not impact Summit's larger equity position should Plaintiffs have wanted to get out immediately for a possible gain, or small loss.

64. Thus, Summit holding and trading the shares as a block (another activity you engaged in without licensing), for Defendants' own benefit, impeded Plaintiffs from mitigating their exposure, by putting their shares into the open market immediately, as was always the advertised intention of the "overnight double" that the trade was said to be.

65. Consequently, very shortly after the transactions were consummated, the stock was quickly decimated, and the investments' value practically evaporated to less than 5% of the investment amount.

**Request for Declaratory Judgment**

66. The Declaratory Judgment Act provides, in its pertinent part, that "[i]n a case within its jurisdiction … any court of the United States, upon filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201.

67. A declaratory judgment action is proper when the judgment will (a) serve a useful purpose in clarifying and settling legal relations at issue; and (b) provide relief from the uncertainty and controversy between the parties. *Aetna Casualty & Surety Co. v. Sunshine Corp.* 74 F.3d 685, 687 (6th Cir. 1996).

68. In light of the events described above, there is a justiciable controversy regarding Defendants' conduct in serving as intermediaries to effect securities transactions, without being dully licensed for it and whether the Martorellos have the right to declare null said transactions and request full restitution of consideration ("contraprestaciones") exchanged between the parties.

### Plaintiffs' Claims

### First: Violation of PRUSA's § 861 and Restitution of monies paid

69. Plaintiffs incorporate and re-allege all prior allegations of this Complaint, as if fully set forth herein.

70. Under PRUSA, it is *illegal* for any person to offer or enter into investment transactions, such as the transactions effected between Summit and the Martorellos, without being licensed as a broker-dealer or agent. 10 PR Laws Ann. § 861.

71. Puerto Rico courts have not hesitated when called to enforce PRUSA's Section 861. In fact, as recent as May of 2022, the Puerto Rico Court of Appeals held, in a case analogous to the instant case, that a defendant's conduct in effecting securities transactions without a license is illegal, prompting the immediate restitution of the moneys invested by customers, such as the Martorellos. See *Bou Santiago v. JCAF Investment, Corp*, 2022 WL 2182415

(2022) (KLAN202200062) (PR Court of Appeals, Decided May 22, 2022).

72. Likewise, a PRUSA violation for offering or selling securities without holding a broker dealer license constitutes a criminal offense, which additionally triggers the punitive damages provisions of Article 1538 of Puerto Rico's Civil Code. See *Pueblo v. Reyes Rivera*, 2012 WL 5196784 (2012 PR Court of Appeals).

73. As such, the Investment Agreements between the parties are null and void, *ab initio*, having no binding and legal effect among them.

74. Accordingly, the Martorellos have right to seek, and hereby seek, a judgment declaring these agreements null and void and ordering the immediate restitution of the monies paid by them in exchange for the securities illegally sold by Defendants.

### Second: Defendants' Material Misstatements and Omissions

75. Plaintiffs incorporate and re-allege all prior allegations in this Complaint, as if fully set forth herein.

76. PRUSA's main purpose or objective is to protect the investors and the general public from fraudulent practices in the business and distribution of securities. *Mendez Moll v. AXA Equitable Life Ins. Co.*, 202 DPR 630, 636 (2019) (citing *Olivella Zalduondo v. Triple S*, 187 DPR 625, 636–637 (2013) and *PaineWebber, Inc. v. First Boston, Inc.*, 136 DPR 541, 543 (1994).

77. PRUSA's Section 851 makes it unlawful for any person, in connection to the offer, sale or purchase of any securities, to directly or indirectly:

> (1) employ any device, scheme, or artifice to defraud;
> (2) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the

light of the circumstances under which they are made, not misleading;

(3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person;

(4) issue, circulate, or publish any material, printed or through electronic means, containing false representation of a material fact, or omitting information concerning a necessary material fact, so that the information which is issued, circulated or published, in the light of the circumstances in which it was issued, circulated or published, leads to an error, or

(5) issue, circulate, or publish any material, or make any written statement, unless the name of the person who issues, circulates or publishes or makes the aforesaid, and the fact that it is that person who issues, circulates, publishes or makes the statement, is clearly indicated in that same communication.

78. Defendants' acts and omissions, as detailed above, fall squarely within PRUSA's proscribed conduct.

79. Moreover, PRUSA's Section 890 contemplates a private right of action to bring suits against any person who:

(1) Offers or sells a security in violation of § 861(a), […], or

(2) offers or sells a security by means of a false statement of a material fact or omitting to state a material fact needed to prevent that any statement made, in the light of the circumstances under which it was made, leads to misunderstanding (the buyer not knowing of the falsehood or omission), and does not suppport the burden of proof that he did not know, and in exercising reasonable prudency could not have known of the falsehood or omission, shall be liable to the person who buys the security, who may file suit to recover the price paid for the security, in addition to the interest at the rate applicable to judicial awards as provided by the regulations approved to such effects the Financing Board created by §§ 2001 et seq. of Title 7, starting on the date in which the payment, costs and reasonable Attorney's fees were made less the sum of any income received on, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon returning the security, less its price when the buyer disposed of it plus interest at the rate applicable to judicial awards as provided through regulations approved to such effects by the Financing Board created by §§ 2001 et seq. of Title 7, as of the date

such security was disposed of.

80. PRUSA's Section 890 contains a burden-shifting provision that Defendants must overcome in this case.

81. Here, as alleged in detail above, Defendants made a series of material misrepresentations and omissions about the true state of affairs of TeraWulf's energy facilities and completely exaggerated the financial position of the company, by describing the investment as "slam dunk", with the "downside risk […] priced in".

82. Likewise, they made incorrect statements about the purchase price of the stock and other key components of the investment, such as whether the company was issuing trading options, whether the investment could be freely sold after closing, and whether the company was simultaneously issuing debt, etcetera. Had Defendants been transparent about these key elements of the transaction, Plaintiff would not have invested in the "overnight double" that Defendants touted TeraWulf to be.

83. Defendants were fully aware that their statements were materially inaccurate.

84. Plaintiffs relied on such statements in good faith, which led them to suffer massive losses on their $4 million dollar investments.

85. Accordingly, Plaintiffs request to be compensated for all the damages suffered as a result of Defendants' conduct, which at the present can be estimated in almost the totality of their $4 million investment, less any net proceeds from the partial sale of a small portion of the shares that the RLM Trust was able to sell to

mitigate its losses.

86. Plaintiffs also request compensation for all consequential damages suffered by them, including the fact that Mr. Martorello had to pass on a Texas-based transaction for $1,100,000, because his money was tied up with Summit. The Texas company was subsequently bought out by a competitor for a significant sum, which would have equated to an $8,700,000 profit to Mr. Martorello.

87. Likewise, Mr. Martorello had to take an extra $4,000,000 in debt from a Dallas-based private credit fund at about a 19% interest rate.

88. Plaintiffs are also entitled to seek and hereby seek all applicable legal interests, costs and Attorney's fees.

### Third: Defendants' contractual breaches and damages

89. Plaintiffs incorporate and re-allege all prior allegations in this Complaint, as if fully set forth herein.

90. PRUSA's Section 890 states, in no uncertain terms, that "[t]he rights and remedies provided by this chapter are **in addition to** any other rights or remedies that may exist at law…" Emphasis added.

91. Accordingly, investors, such as Plaintiffs, are not limited by PRUSA's list of remedies. See *Mendez Moll v. AXA Equitable Life Ins. Co.*, 202 DPR 630 (2019)

92. Mendez Moll's concurring opinion by Justices Pabón Charneco, Kolthoff Caraballo, Rivera García and Estrella Martínez recognizes the existence and validity of a cause of action for breach of contract, in cases where the seller of a financial product contractually agrees to comply with the statutes, rules and regulations of the securities industry.

93. That is precisely what happened here, pursuant to the clear text of Sections 3 (Representations and Warranties) and 4 (Indemnification) of the Investment Agreements.

94. As such, Plaintiffs can bring and do bring an action for breach of contract against Defendants for their failure to comply with the applicable (i) standards of professional conduct and duties toward their clients, (ii) financial responsibility requirements, (iii) recordkeeping requirements, and (iv) supervisory obligations.

95. Among other things, Defendants breached their fiduciary duties towards Plaintiffs by failing to recommend suitable investments to them, which were not aligned with their risk appetite and investment strategies.

96. Additionally, Summit failed to adequately supervise and train Basile, to avoid his conduct described herein, particularly the over-aggressive sales practices that he displayed in describing the TeraWulf investment and his conduct in pressing Plaintiffs to invest in this quick "overnight double".

97. Plaintiffs estimate the damages stemming from Defendants' breach of contract in a sum of no less than $4,000,000.

98. Moreover, Plaintiffs are entitled to bring a contractual action to enforce the broad terms of the Indemnification clause agreed by Defendants.

99. Defendants expressly agreed to compensate Plaintiffs for any damages suffered by them even as a result of alleged omissions, alleged misrepresentations and alleged breaches; all of which have been described in detail in this Complaint.

100. This is a material and essential covenant agreed by the parties, which moved Plaintiffs to enter into the agreement.

101. Tellingly, the indemnification clause agreed by the parties covers "intra-party" conduct, specifically "any misrepresentation or untrue statement or alleged misrepresentation or untrue statement of a material fact **made by Summit** to the Covered Members". Emphasis added.

### Fourth: Punitive Damages

102. Plaintiffs incorporate and re-allege all prior allegations in the Complaint, as if set forth herein.

103. Article 1538 the 2020 Puerto Rico Civil Code, which applies here, given that Defendants' conduct took place on or about November 2021, contemplates the imposition of punitive damages, when the defendant's act or omission constitutes a crime or are performed in bad faith or with dolus.

104. Under PRUSA the offer or sale of securities without holding a broker dealer license constitutes a criminal offense, which further triggers Article 1538's punitive damages provisions, which Plaintiffs invoke herein and seek compensation in an amount equal to $8,000,000 for the losses suffered by them in the failed investments in TeraWulf.

WHEREFORE, Plaintiffs respectfully requests that the Honorable Court: (1) grant the instant Complaint entering a judgment declaring the Investment Agreements null and void *ab initio* and ordering Summit and Basile to restitute the monies paid by Plaintiffs; (2) compensate all the damages suffered by Plaintiffs, estimated in no less than $4,000,000, plus all consequential damages specifically alleged above, as a result of Defendants' misrepresentations and omissions, including all applicable legal interests, costs and attorney's fees for Defendants'

obstinate conduct and temerity; (3) adequately compensate Plaintiffs for Defendants' contractual breaches, as alleged in detail above, for a sum of no less than $4,000,000 and issue an Order to enforce the broad terms of the Indemnification clause agreed by Defendants; (4) award all punitive damages to which Defendants are entitled, for an amount not to exceed $8,000,000; plus (5) any other relief available at law or in equity.

**RESPECTFULLY SUBMITTED.**

In Guaynabo, Puerto Rico, this 5th day of December, 2022.

**H. LOPEZ LAW, LLC**

Metro Office Park
Building 11, Suite 105-A
Guaynabo, PR 00968
Telephone: (787) 422-0243

*/s/Heriberto López-Guzmán*
Heriberto López-Guzmán
USDC-PR No. 224611
hlopez@hlopezlaw.com