UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| Matthew Martorello, Rebeca L. Martorello, and the RLM 2018 Family Trust; <br><br> Plaintiffs <br><br> v. <br><br> The Summit Investment Group, LLC, Michael C. Basile, his wife Victoria "Vicky" Basile and the partnership comprised by them, John Doe, *et al*; <br><br> Defendants | Civil Action No. 22-1602 (CVR) <br><br> Declaratory Judgment; <br> Violations of the Puerto Rico Uniform Securities Act; <br> Breach of Contract; <br> Action to enforce personal guarantees; <br> Punitive Damages <br><br> Trial by Jury demanded. |

"That's the magic to our business. It's called an '**introducing broker**'. I'm giving u the whole playbook. This all just stays between us amigo!"

Michael C. Basile
The Summit Investment Group, LLC
(Emphasis added)

### First Amended Complaint for Violations of the Puerto Rico Securities and Contract Laws

**TO THE HONORABLE COURT:**

**COME NOW** plaintiffs Matthew Martorello, Rebecca L. Martorello, and the RLM 2018 Family Trust (collectively the "Plaintiffs" or the "Martorellos"), through the undersigned attorney, and very respectfully state, allege and pray as follows:

### Nature of Complaint and Factual Background

1. This action stems from The Summit Investment Group, LLC ("Summit") and co-defendant Michael C. Basile's ("Mr. Basile" or "Basile") conduct as *intermediaries* to a transaction involving the sale of stock from a single entity. The

stock in controversy was issued by TeraWulf, Inc., as part of a private placement.

2.   In plain terms, Summit bought the stock from TeraWulf and then transferred that same stock to the Martorellos for a commission-like fee for its efforts in getting access to this "difficult" to reach and "highly sought after" stock. Accordingly, it served as a conduit to identify, negotiate, structure, and complete the transaction.

3.   It was a one-shot deal focused on the acquisition of the stock *through* Summit and Basile's services as intermediaries.

4.    The Martorellos did not purchase the stock directly from TeraWulf nor directly from TeraWulf's underwriters or Investment Bankers, Moelis & Company.

5.   The Martorellos also did not execute any subscription agreements with TeraWulf or its underwriters; a key document which is required when an issuer of restricted stock sells its stock directly to an investor.

6.   Additionally, the Martorellos did not enter into a partnership with Summit or Basile, nor did they sign any operating agreements to be associated with Summit and Basile through a Limited Liability Corporation or in their capacity as a "Fund".

7.    Instead, for each key step of the transaction, the Martorellos relied on Summit and Basile's efforts to effectuate their acquisition of the TeraWulf stock.

8.   For example, Summit and Basile (a) *offered* to sell the stock to the Martorellos, (b) *negotiated* their compensation for selling/getting the stock, (c) *marketed* the stock by focusing on the prospects of TeraWulf's business, (d) *structured* the mechanics of the transaction; (e) *received* the Martorellos' funds in Summit's own bank accounts, and (f) after funding was completed, they *delivered* the stock to the Martorellos.

9.  To add insult to injury, Summit and Basile boasted about their role as "**introducing brokers**", which they described as the "magic to our business".

10. As such, they undoubtedly held themselves out as broker dealers, who provide services as intermediaries to transactions involving the offer or sale of stock for a fee, *even though they have never been licensed to act as broker dealers or broker dealer agents in Puerto Rico or elsewhere*.

11. But unfortunately, this is not the only problem with the transactions at issue. In addition to having their hands all over the transaction without being licensed to do so, Summit and Basile resorted to material misrepresentations of TeraWulf's business prospects to wrongfully entice the Martorellos into a deal they would not have accepted had Summit and Basile come clean to them. At that time, Summit and Basile knew that those representations were false.

12. Accordingly, this action is vital to remediate Summit and Basile's wrongful and deceitful conduct, stemming from (a) the illegal offer and sale of securities *without having the necessary authority under Puerto Rico law to execute said transactions as broker-dealers* and (b) the gross misrepresentations or omissions of material facts, which led the Martorellos to enter into transactions (to the tune of $4,000,000) that otherwise they would have declined.

13. Under the Puerto Rico Uniform Securities Act ("PRUSA"), 10 PR Laws Ann. §851, *et seq.*, it is *illegal* for any person to offer or enter into investment transactions, such as the transactions effected between Summit and the Martorellos, without being licensed as a broker-dealer or agent. 10 PR Laws Ann. § 861. As an agent of Summit, Mr. Basile is equally forbidden from facilitating or

participating in such transactions and, as such, he is jointly and personally liable.

14. Moreover, *this action seeks to hold Mr. Basile accountable for his personal guarantee of the transaction*, where he confirmed in writing that the Basiles (who "keep their word") would "guarantee you against any losses" and to enforce the indemnity provisions agreed by the parties.

**The Parties**

15. Matthew Martorello is of legal age, married and a resident of Dallas, Texas. Mr. Martorello's domicile is in 3805 Greenbrier Dr., Dallas, Texas 75225.

16. Rebecca L. Martorello is of legal age, married to Mr. Martorello and a resident of Dallas, Texas. Ms. Martorello's domicile is in 3805 Greenbrier Dr., Dallas, Texas 75225.

17. The RLM 2018 Family Trust (the "RLM Trust) is a trust organized under the laws of Texas and its principal place of business is in 3805 Greenbrier Dr., Dallas, Texas 75225. Mr. Martorello serves as the Trust's trustee and is also appearing on behalf of the Trust in this action.

18. The Summit Investment Group, LLC, is a limited liability corporation organized under the laws of Puerto Rico. Upon information and belief, Summit is a single member LLC, wholly owned by Mr. Basile. Summit's principal place of business is in Puerto Rico. According to the Puerto Rico Department of State records, its business and mailing addresses is Urb. Costa de Oro #81, Suite 203, Dorado, PR 00646.

19. Michael C. Basile is of legal age, married to Jane Doe and a citizen of Puerto Rico. Mr. Basile's domicile is in Dorado, Puerto Rico. His physical address is 3207

Plantation Village, Dorado, Puerto Rico 00646.

20. Victoria "Vicky" Basile is of legal age, married to Mr. Basile and together they form, upon information and belief, a conjugal partnership or community property, which is legally responsible for the damages caused by Mr. Basile's conduct.

21. John Doe, who is included as a fictious defendant that cannot be readily identified at the time of this lawsuit, is an executive(s) of Summit who actively participated in the scheme to have the Martorellos invest in an entity whose financial position and operation was far worse than that represented to the investors in the investment decks tendered to them to entice them to make their decision.

## Jurisdiction and Venue

22. The Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1), since plaintiffs and defendants are citizens of different States and the amount in controversy exceeds $75,000.

23. Venue lies in this Court pursuant to 28 U.S.C. § 1391(a)(c) since defendants are subject to the personal jurisdiction of this Court and a substantial part of the events giving rise to the claims took place in Puerto Rico. Moreover, Defendants are found in Puerto Rico, transact business here and a significant part of the transactions and acts or omissions constituting the violations/offenses described herein occurred in Puerto Rico.

## Additional Facts Common to All Claims

24. On November 26, 2021, each of the co-plaintiffs separately entered into

three agreements with Summit for the acquisition, through Summit, of certain "Covered Investments" in stock from an entity called TeraWulf, Inc. (the "Investment Agreements"). See **Exhibit 1**, whose terms are incorporated by reference herein and included as part of the allegations in support of the First Amended Complaint ("FAC").[1]

25. TeraWulf was a private bitcoin mining company that was planning to become a publicly traded company at the end of 2021 by way of a merger with an existing public company called IKONICS Corporation –a Minnesota imaging technology company.

26. TeraWulf is in the business of owning and operating fully integrated and environmentally clean bitcoin mining facilities in the United States. Bitcoin mining operations generally consist of industrial size plants of computers that are constantly performing millions of calculations per second to guess the number combination that Bitcoin's algorithm requires to update/record transactions in its public ledger. For each correct guess the mining operation collects six and a quarter new Bitcoins as compensation.

27. The capital raised through these equity transactions was expected to enable TeraWulf to significantly increase its already existing mining capacity, to strategically position itself in the bitcoin mining industry.

28. Since TeraWulf's stock was not publicly traded until the merger was completed, getting access to its stock was difficult.

29. But Summit and Basile had access to the stock and offered it to investors,

---

[1] The FAC only includes one of the agreements, since their language and terms are identical.

such as the Martorellos, as a unique opportunity to invest in a new offering of TeraWulf's private stock that was later going to convert into a publicly traded stock (the "PIPE" deal, Private Investment in Public Equity).

30. The new shares of TeraWulf's common stock issued through the PIPE deal, however, were restricted securities that could not be immediately circulated to the public. Summit and Basile knew or should have known about this, but misinformed the Martorellos about this material fact, as later described in this FAC.

31. Exhibit A to the Investment Agreements describes the "Covered Investments" which Defendants were offering and selling as follows:

EXHIBIT A

Covered Investments

Covered Investments under this Agreement are set forth below:

Company's $1,250,000.00 Investment in Terawulf Inc.'s private equity, an issuance by "WULF" of unregistered common stock through a 4a(2) private exemption under the Securities Act of 1933 at $16.72 a share. The issuance is likely to occur immediately post-closing of WULF's reverse merger with Ikonix ("IKNX") as contemplated within the Form S-4 filed on July 30, 2021 with and approved since by the SEC by "Telluride Holdco, Inc.". The parties anticipate IKNX shareholder vote on December 10th and closing and issuance on December 13th, but may be subject to unforeseen delay.

32. Significantly, the express terms of the Investment Agreement, which identifies the Martorellos as the "Company", provide that the Company/Martorellos would be "investing in" TeraWulf's stock.

33. The "investing in" language equates to acquiring the TeraWulf stock.

**The transaction at issue had nothing to do with a "Fund"**

34. As the express terms of the Investment Agreement show, the transaction focused on the acquisition of a single stock, as opposed to an ongoing relationship

where Summit or Basile would advise the Martorellos on investment strategies or manage the Martorellos' investments.

35. Summit and Basile did not offer the Martorellos an opportunity to invest in a pool of funds under their management.

36. As a matter of fact, there were no capital contributions by the Martorellos to any "Fund". They simply wired funds to Summit, so Summit could transfer the TeraWulf stock back to them.

37. The Martorellos received no business literature about a "Fund", no information about the "Fund's" purported investment strategy, no information about the "Fund's" key personnel and no information about the "Fund's" historic performance.

38. The Martorellos did not even sign any opening documents with a "Fund" and did not engage in any "onboarding" into a "Fund".

39. Indeed, the Martorellos have never received a single piece of correspondence from a "Fund" before, during and after completing the transaction, nor account statements detailing the monthly status of their purported "Fund" investments.

40. The transaction's goal was purely one: to buy the TeraWulf stock through Summit and Basile based on Summit and Basile's efforts on behalf of the Martorellos.

41. For this, Summit and Basile had to, as a first step, acquire the TeraWulf stock (which they did) and then, as a final step, transfer that stock to the Martorellos (which they also did).

42. Between the first step and the final one, Summit and Basile engaged in multiple efforts to effectuate the transaction: they *pitched* the investment opportunity to the Martorellos, *negotiated* their compensation for selling/getting the stock, *explained* the mechanics of the TeraWulf's private placement deal, *arranged* for the acquisition of the stock, *provided* wiring instructions to the Martorellos, *calculated* and *determined* the amount of stock to be allocated to the Martorellos, and lastly *transferred* the stock to the Martorellos, among other things.

### Summit's commission-like compensation was tied to the underlying transaction.

43. As compensation for its services as an intermediary, Summit charged the Martorellos a transaction-based fee or 20% commission.

44. Section 2 of the Investment Agreement regulates Summit's compensation "in connection with" the investments by the Martorellos, as follows:

> 2.    **Compensation**.
>
>        (a)    The Company agrees to compensate Summit in the manner set out in Exhibit B hereto, which may be updated from time-to-time to reflect new compensation arrangements under this Agreement provided such update or amendment is consented to by both parties and documented in writing. Any fees or other compensation payable to Summit pursuant to Exhibit B will be calculated and paid within ten (10) days after receipt thereof by the Company or its relevant affiliate or Fund.
>
>        (b)    Summit acknowledges it has no right to compensation other than as set forth in this Section 2. In addition, the Company and Summit agree that no compensation will be earned by Summit in connection with any other investments in the Fund or otherwise that are not Covered Investments as set forth in Exhibit A hereto.

45. The Investment Agreement contemplates that Summit's fee is tied to or "in connection with" the underlying investment in the TeraWulf stock, which is identified as the "Covered Investment".

46. The "in connection with" language confirms that Summit's compensation is indeed a transaction-based fee.

47. Section 2 also confirms that Summit has "earned" its compensation by closing the deal, although the final amount of that compensation would be determined at a future date.

48. Exhibit B to the Investment Agreements further describes Summit's compensation as follows:

### EXHIBIT B

#### Compensation

a) 20% Carry fee earned by Summit on all gains above the $16.72 cost basis in this TeraWulf, Inc equity position. This 20% Carry Fee will be calculated from subtracting the $16.72 cost basis of the investment from the opening share price/valuation the day after the IKNX ticker trades as WULF as outlined in the July 30, 2021 S-4.

The carry fee portion of the Fee Arrangement will be paid to Summit the day Summit transfers their remaining investment shares to the Company.

49. Exhibit B confirms that the 20% commission-like fee was *payable* (as opposed to earned) immediately after the IKONICS/TeraWulf merger was completed and TeraWulf began publicly trading its stock.

50. But tellingly, Summit's right to the commission *is not* conditioned to Summit's performance.

51. Summit's right to the commission also had nothing to do with the Martorellos' *realizing* a gain or loss *after selling* the stock above or below their acquisition price.

52. Indeed, the stock did not have to be sold at all by the Martorellos for Summit to earn or receive its commission payment.

53. In contrast, Summit was *entitled* to its commission once it entered into the Investment Agreement and received the Martorellos' payment for the TeraWulf stock.

54. Here, per the Investment Agreements, the final amount of the commission had to be calculated by subtracting the $16.72 stock's purchase price from the opening share price the day *after* the stock began trading post merger.

55. The TeraWulf stock, according to public records, began trading on December 14, 2021. **The stock's opening price the day after, on December 15, 2021, was $22.64**. As such, there was a $5.92 dollar difference ($22.64 minus $16.72) to use as a base to calculate Summit's 20%, which equates to a $1.184 fee per share (20% of $5.92).

56. *The Martorellos' $4million investment represented 239,234 shares of TeraWulf at $16.72, which brings Summit's 20% fee to a grand total of $283,253.58 (239,234 shares multiplied by $1.184).*

57. Accordingly, <u>Summit in theory</u>, could have sought to collect its 20% commission or $283,253.58 from the Martorellos, but surprisingly did not do so, because (a) it was able to unload $4million worth of TeraWulf shares that it had already made a commitment to buy, (b) it was aware that it had defrauded the Martorellos with the sale of a stock whose value quickly decimated, (c) it had failed to complete delivery of the stock on time to the Martorellos, and (d) because the Investment Agreements are null and void *ab initio*, as they run afoul of PRUSA's broker dealer provisions.

**Defendants' "role" as explained by Basile himself.**

58. Prior to the parties executing the Investment Agreements, the Martorellos and Basile exchanged dozens of written communications discussing the mechanics of the transaction and Summit's/Basile's role.

59. From the outset, Basile described his business structure as follows: "We primarily **trade stock** of companies offering shares to the public at an initial or secondary round thru (sic) various investment banks we deal w[ith]. We have a strategic and competitive advantage in this business bc at its core **getting these shares** are difficult and highly sought after and we've been around for 20 years (sic) so we know how to navigate the landscape." Emphasis added.

60. In other words, Summit specializes in providing access to clients to "get" shares from initial or secondary offerings of shares/stock that are difficult to reach or highly sought after. They basically boasted that they had access to privately placed sought-after securities.

61. The aforesaid is a typical three-party transaction, with Summit and Basile as the middleman.

62. On one side of the equation is the investor, here the Martorellos. On the opposite side is the issuer of the stock, TeraWulf, or the issuer's underwriter, here Moelis & Company. Right in the middle is the intermediary, Summit and Basile, connecting one side with the other, by, *inter alia*, marketing the investment, setting the price for their services and other negotiated terms, taking control of the money to complete the transaction, and delivering the stock from one side to the other.

63. In Basile's own words: "**Shares are going from the PIPE to Summit. Summit will transfer shares to you and your buddy**." Emphasis added.

64. It is a classical three-step transaction, where Summit gains access and "transfers" the stock to the Martorellos at the tail end of the transaction *for a commission*, as opposed to re-selling the stock to the Martorellos *for a profit*.

65. Indeed, Basile himself confirmed that Summit did not take any management fees for professional services but rather a percentage of the accounts (i.e. stocks) they assist in getting access to: "We don't take a management fee. Our deal is a profit sharing agreement **on the accts we bring to the table** and manage for u (**and remember we guarantee you against any losses**)". Emphasis added.

66. Unarguably, Summit and Basile were serving as intermediaries/brokers in connection with the offer and sale of stock (as opposed to a "fund"), and they even recognized so when the Martorellos pressed them about having the deal in writing.

67. Skeptical about the idea of transferring $5 million to Summit without a written agreement, Mr. Martorello wrote to Basile asking for a written intermediary agreement: "I love and support you greatly, but can't wire you $5mm bucks until this **intermediary contract** thing is finalized." Emphasis added.

68. Basile replied confirming the role as intermediary: "Got it. **I'm not concerned about that <u>intermediary contract</u>. We'll get that to u today**. **Basiles keep their word and u won't see any surprises there**. But I just can't have a lot of time to mobilize the 'waitlist' guys who want in if u decide to not do the $5mm slug. You catch my drift?" Emphasis added.

69. Summit was indeed in a rush to broker deals with investors (whether the Martorellos or others in a "waitlist") to give them access to the TeraWulf private stock offering which was taking place at a specific date. The deal had nothing to do with an ongoing "fund" where potential investors can generally join at any time.

**The underlying "investment" as explained by Defendants, through statements rife with misrepresentations and misleading data.**

70.  As it relates to the underlying investment transaction, Basile explained it as follows:

> The merger will finalize in early Nov. So your (sic) talking 30 days of private equity until u get the shares transferred to your brokerage acct and no lock up (freely tradeable). It's a green energy crypto mining play. Guys are brilliant. My buddy was the guy behind RIOT and MARA. This is his 3rd deal. **My group is doing $25mm. You should do $10-15mm.** Valuation of the company today is roughly $3bb. We're **getting stock** at $1.75-2bb valuation. Roughly 40% discount to where it's currently trading. (Emphasis added)

71.  There was clearly no "fund" to invest in. Basile's own group was buying or "getting" $25 million of the TeraWulf stock.

72. And he recommended the Martorellos, as a typical broker would do, to buy or get their own stock, in a range between $10 to $15 million.

73. Basile further explained:

> Where (sic) getting stock at $1.75bb [valuation] and its at $3.4bb [current valuation]. **That's a double**. It might trade down a little bit but **the returns are still juicy**. I'll tell u I feel very confident it ain't going back to 1.75bln valuation (where we're getting in)...

Emphasis added.

74. Summit and Basile further enticed and recommended the Martorellos to invest in these securities, which Basile touted as a quick "double" with "juicy returns", by highlighting a June 2021 investment deck showing an $800 million EBITDA, which as explain latter herein was misleading.[2]

75. Defendants further boasted: "**It's a slam dunk** on a risk reward basis".

---

[2] EBITDA stands for Earnings before Interest, Taxes, Depreciation and Amortization. It is a term widely used as an indicator of the overall profitability of an ongoing business.

We're getting stock at $16.72. **Downside risk is priced in**. It hit $29.30 today. We're **not talking a private equity lock up**. We're talking **dead money** for 60 days until the merger finalizes. I'd **take a slug** of this, bro."  Emphasis added.

76. The Martorellos were also misled about the risks associated with the transaction. Worried about whether there would be enough trading volume to allow them to sell the stock on an emergency basis, if needed, they specifically asked Summit and Basile about this sensitive matter. But unsurprisingly, given their desire to unload the stock to the Martorellos, Summit and Basile categorically confirmed to them that "**[v]olume won't be a problem**."

77. They even represented that the "**Stock should go up [in value] on announcement**." And advised the Martorellos to buy as much stock as they could and "**go look under your couch cushions**", implying that they should invest as much money as possible in this deal. Emphasis added.

78. All in all, Summit and Basile said whatever they had to say, whether accurate or not, to convince the Martorellos to participate in "[…] **an amazing deal** [which] you should be that cynical bc **it is that juicy**." Emphasis added.

**Summit agreed to indemnify the Martorellos for any actual (or even alleged) misrepresentations or untrue statements.**

79. As part of the Investment Agreements, Defendants expressly represented to Plaintiffs *that Summit had the authority to enter into and perform the agreement* *and that it was fully aware of its responsibility for complying with state securities laws*:

3.    **Representations, Warranties and Covenants**.

(a)    Summit represents that it is a single member LLC.

(b)    Each party represents and warrants to the other that it has the full legal right to enter into and perform this Agreement and that its entry into and performance of this Agreement does not and will not violate any fiduciary or other duty it may have to any other person.

(c)    Each party acknowledges that it is responsible for its own compliance with state and federal securities laws, including the Securities Act of 1933, the Securities Exchange Act of 1934 and all rules promulgated thereunder.

80. Additionally, Summit agreed to an extremely broad indemnification and hold harmless provision in favor of the Martorellos, which even covered "alleged misrepresentations", "alleged omissions", and "alleged breaches", *inter alia*. That clause is contained in the Investment Agreements executed by the parties. Due to its importance, we reproduce below the indemnification clause in its entirety:

4. Indemnification. (a) Summit agrees to indemnify and hold harmless the Company, its officers, directors, employees, legal counsel and its affiliates (each, a "Company Indemnified Party") against any and all losses, claims, damages and liabilities, joint or several, and expenses (including all legal or other expenses reasonably incurred by the Company) caused by or arising out of (i) any misrepresentation or untrue statement or alleged misrepresentation or untrue statement of a material fact made by Summit to the Covered Members, or the omission or the alleged omission to state to the Covered Members a material fact necessary in order to make statements made not misleading in light of the circumstances under which they were made (except to the extent such misrepresentations, untrue statements or omissions are based on information provided to Summit by the Company), (ii) any misrepresentation or untrue statement or alleged misrepresentation or untrue statement of a material fact contained in any document furnished to the Covered Members, or the omission or the alleged omission to state in the documents furnished to the Covered Members a material fact necessary in order to make the statements therein not misleading in light of the circumstances under which they were made, to the extent such misstatements or omissions are made in reliance upon and in conformity with written information furnished by Summit for use in the documents 2 furnished to the Covered Members, (iii) any breach or alleged breach of any representation, warranty or covenant made by Summit in this Agreement, or (iv) Summit's bad faith, gross negligence or willful misconduct in

performing the services described herein. Summit agrees to reimburse the Company Indemnified Party for any reasonable expense (including reasonable fees and expenses of counsel) incurred as a result of producing documents, presenting testimony or evidence, or preparing to present testimony or evidence (based upon time expended by the Company Indemnified Party at its then current time charges or if such person shall have no established time charges, then based upon reasonable charges), in connection with any court or administrative proceeding (including any investigation which may be preliminary thereto) arising out of or relating to the performance by the Company Indemnified Party of any obligation hereunder.

81. The parties further agreed that Puerto Rico law would control. ("Governing Law. This Agreement is governed by the internal substantive laws, but not the choice of law rules, of Puerto Rico.")

### Summit's (and Basile's) Illegal Broker Activity

82. Defendants' role as intermediaries to securities transactions for a hefty commission is the quintessential example of broker dealer activity.

83. Defendants, in essence, have engaged in the business of effecting transactions in securities on the account of others *without being licensed by the appropriate authorities*: the Office of the Commissioner of Financial Institutions of Puerto Rico ("OCFI") and the Financial Industry Regulatory Authority.

84. At all relevant times, OCFI's and FINRA's records show that neither Summit nor Basile are registered as broker-dealers or agents.

*85.* Defendants have repeatedly held themselves out as being in the business of effecting transactions for others.

*86. They even openly described themselves as "introducing brokers".*

*87. And they also described the Investment Agreement as an "intermediary contract".*

88. First Circuit precedent clearly holds that "[t]ransaction-based compensation is a "hallmark" indication that a party has acted as a broker and must register because it 'represents a potential incentive for abusive sales practices that registration is intended to regulate and prevent.'" *EdgePoint Capital Holdings, LLC v. Apothecare Pharmacy, LLC*, 6 F.4th 50 (1st Cir., 2021).

89. Tellingly, Defendants are not engaging in these transactions to invest for themselves to simply make an arbitrage or spread in a potential resale. Instead, they are serving as conduits to third parties, such as Plaintiffs, to effectuate the transactions in exchange for a considerable commission-like fee.

90. Defendants' conduct is not due to an innocent/isolated event, but rather a *modus operandi* they have repeatedly put in practice, in an open affront to PRUSA's provisions, which require that individuals and entities engaging in broker dealer activity be previously registered and licensed.

91. Summit and Basile even spoke openly about the "drift" they were having to "mobilize the 'waitlist' guys" in line for the TeraWulf stock if the Martorellos passed on it.

92. Upon information and belief, Defendants have also pitched the TeraWulf stock at issue here to other investors/customers, such as Mr. Loonie Davis, a friend of the Martorellos, and others.

93. Additionally, after the issuance of the TeraWulf stock to Summit, Defendants brokered a partial resale of the stock purchased by the RLM Trust; *additional* activity for which they had to be licensed but were not.

94. In sum, Defendants have been acting as an unregistered broker or agent in

direct violation of PRUSA's express provisions, on more than one occasion.

95. First Circuit caselaw has also interpreted the term "effecting securities" broadly. <u>See</u> *Massachusetts Fin. Servs. Inc., v. Securities Investor Prot. Corp.,* 411 F. Supp 411, 415 (D.Mass.), *aff'd,*545 F.2d 754 (1st Cir.1976) (holding that a person effects transactions in securities if he or she participates in such transactions "at key points in the chain of distribution").

96. That also holds true here, where Defendants are not simply introducing investors to an investee company (or a fund) and subsequently withdrawing from any further negotiation or sale.

97. A typical "finder" would simply connect an investor with another party selling a security or managing securities investments or a fund. From that point forward, all the interactions would take place directly between the investor and the security seller/manager or fund. *But this never happened here.*

98. The Martorellos did not reach any deals with TeraWulf, nor did they sign investment questionaries with them or subscription agreements.

99. The Martorellos also did not reach any deals with Moelis & Company, TeraWulf's investment bankers for the PIPE deal.

100. Based on Summit's representations, it was Summit itself who executed subscription agreements with TeraWulf.

101. Those subscriptions agreements, to which the Martorellos are not privy to at this time, should have clear and categorical language warning Summit and Basile that they were prohibited from brokering the stock.

102. Defendants were also actively participating in key points of the

transactions, by soliciting Plaintiffs' investment, negotiating their own fees, and executing the transactions by handling all the delivery hurdles associated with securities that were (in their origin) exempted from registration.[3]

103.    Moreover, Defendants (i) provided advice regarding the prospects of the investment in TeraWulf *vis-à-vis* other players in the mining industry, (ii) tendered and highlighted investment information to Defendants about the financial position and operations of TeraWulf; (iii) heavily marketed said investment as at least an "overnight double" with no downside, (iv) boasted about Summit and Basile's own investments in said company and (v) about how Summit and Basile themselves were "involved with the company and getting a special look".

104.    By participating in such important parts of the transaction, among other activities, Defendants played a proactive and aggressive role, as opposed to merely acting as a finder between two parties to a transaction involving the purchase and sale of securities or the investment in a "fund".

**IKONICS/TeraWulf stock behavior pre- and post-merger**

105.    Prior to the merger with TeraWulf, IKONIC focused its business on high-quality imaging equipment and products, including glass and crystal engraving products.

106.    In May of 2021, prior to the announcement of the TeraWulf merger, IKNOICS' stock was modestly trading at $9.39 per share.

107.    Summit and Basile began courting the Martorellos in October 2021,

---

[3] The Securities Exchange Commission has repeatedly stated that a person who sells securities that are exempt from registration (including private placements under Regulation D of the 1933 Securities Exchange Act) must nevertheless register as a broker-dealer.

and continued throughout November 2021.

108.     On November 1st, 2021, *now that the plans to merge into TeraWulf were publicly known*, the stock's price increased more than 300%, trading at $33.46. (The merger allowed TeraWulf to become a publicly traded company by stepping into the shoes of a company that was already publicly traded, IKONICS).

109.     The company's core business was undergoing a significant spin off from focusing on imaging equipment to now leading the way in the mining of bitcoin. The table below, which summarizes the stock's five-year history, shows how the stock's price skyrocketed in November 2021 and how it swiftly deteriorated immediately thereafter:



Source: Yahoo Finance

110.     The stock reached its highest point on Nov 15, 2021, trading at $42.31 per share.

111.     The Martorellos finally agreed with Summit to acquire the stock on November 26, 2021, at a price of $16.72 per share.

112.     At that time, the "overnight double" touted by Summit and Basile

seemed reasonable, but things quickly took a dark turn, even though Summit/Basile represented that the risk was "priced in" and that returns would still by "juicy" and would even "double on announcement".

113.     Shortly after Summit had contractually locked in the Martorellos to acquire the stock at $16.72 per share, on December 1, 2021, the stock plummeted from an all-time high of $42.31 to $15.05 per share, losing more than half its value in a matter of days:



Source: Yahoo Finance

114.     The stock, in fact, behaved as a typical "**pump and dump**" fraudulent scheme, with Summit's hands all over the transaction.

115.     At this time, Summit had not even transferred the stock to the Martorellos, nor were they able to instruct Summit to trade on the stock on their behalf to mitigate potential losses.

116.     *Summit finally transferred the stock to the Martorellos on January 10, 2022 – almost two months after receiving $4 million dollars from the Martorellos.* By that time, the stock was trading at ~$11.68, significantly below the $16.72 price

agreed by the Martorellos.

117.    At this time, contrary to Summit and Basile's representations, volume was in fact a problem, as there was no trading volume to allow the Martorellos to sell the stock. This liquidity problem, with too many sellers, prevented the Martorellos from getting rid of the stock.

118.    From there, the stock continued its downward spiral. On March 1, 2022, it was trading at $8.40:



Source: Yahoo Finance

119.    On June 1, 2022, the stock reached a value of $1.20 per share.

120.    Currently, the stock trades below $1 dollar, at ~$0.79 cents per share:



Source: Yahoo Finance

**Defendants' additional material misrepresentations and omissions**

121.    Defendants first reached out to Plaintiffs to solicit their investment in TeraWulf in October of 2021 *but were quickly turned down*.

122.    Undeterred by this rejection, they sought to improperly entice Plaintiffs with knowingly stale and inaccurate/incomplete information about TeraWulf's deteriorating financial numbers.

123.    Upon information and belief, Defendants had first-hand knowledge that the establishment of TeraWulf's mining operation (and thus its revenue and cash flow projections in the June 2021 investment document that they used to solicit Plaintiffs' investment) was grossly misrepresented, as compared to the then present state of affairs.

124.    Faced with the fear of their own diminishing investment in TeraWulf, for which they were overcommitted since June of 2021, Defendants appear to be secretly seeking to unload that position to an unwitting buyer.

125.    For example, Defendants, who had a prior $2 million investment in a TeraWulf Series A round, had access to information clearly showing that TeraWulf's ability to secure the necessary miners was materially challenged by supply chain issues and chip shortages, among others.

126.     Defendants were not detached investors, with little or no information on the current affairs of TeraWulf. They routinely and openly talked about their "buddy", Bryan Pascual, who had built out the mining infrastructure of other successful public mining companies and was now replicating this work with TeraWulf's energy facilities.

127.    Yet, the construction of TeraWulf's energy facilities was far from being a successful story (as Defendants led Plaintiffs to believe) and was, indeed, substantially behind schedule and the stale forecasts that Defendants provided the Martorellos.

128.    More specifically, after soliciting a second time, on November 21, 2021, Summit's CFO provided Defendants with a *June 2021* investment deck, which materially differed from the forecasts the company was then expecting.

129.    Pressed with questions from the Martorellos about the suitability of the investment, Basile communicated "the game is to buy miners and get them online" and "it's simply a function of securing cheap energy and buying miners".

130.    Indeed, the progress in those regards was of paramount importance to any investment consideration on November 21, 2021. The June investment deck showed revenue generation before the end of the year and a significant ramp to scale across 2022, which by November 21 was no longer in the cards.

131.     In fact, there would be no 2021 revenue at all, as the June 2021 investment deck suggested.

132.     The company would not begin trickling in revenue until April of 2022, and the then overwhelmingly truncated projections for "get[ting] miners online" thereafter (as a result of the supply chain delays and chip shortages) completely devastated the investment.

133.     Thereafter, Mr. Martorello began to realize "the power/miner/revenue plan was bogus", as he communicated to Basile once it was too late. Basile's sentiments in response were that "it's just a matter of time or if we're willing to stomach this downturn"; a material fact that the Martorellos should have been permitted to consider *prior to* Defendants taking their money for a transaction they described more than once as a "slam dunk", "overnight double" investment with the "downside risk [...] priced in."

134.     Moreover, Summit's recommendation to "stomach this downturn" equates to a "recommendation to hold", for which Summit is further liable to the Martorellos, given that Summit made such recommendation without having a clear picture of the Martorellos' risk appetite or long-term investment strategy.

135.     All in all, Defendants were fully aware that they pitched an investment deck that was completely bunk as of November 26, 2021. As Mr. Martorello stated to Basile, the Martorellos "w[ere] sold on a deck with 800mm EBITDA. Not 300mm of revenue on the same [level of power]."  But, as previously stated, Summit and Basile wanted to unload their own position on a third party to save themselves.

136.     Moreover, Defendants incorrectly represented that global financial

services firms specializing in institutional trading, such as BTIG, would be covering the stock, and that the stock would be trading options.

137.    Defendants also failed to inform the Martorellos that there was a $123.5 million debt round that was closing alongside the TeraWulf private placement deal.

138.    This was material because those debt holders had the right to sell additional TeraWulf shares, which they did, flooding an already saturated market with no appetite for the stock once it started its dramatic downward spiral.

139.    In other words, the Martorellos were totally unaware that there were ~$123 million worth of shareholders who had a right to sell their shares at a given date, which further complicated the liquidity problems the stock was facing.

140.    Had the Martorellos knew this, they would have been able to consider selling their stock *before* the debt holders had a right to sell.

141.    This lack of transparency effectively prevented the Martorellos from having an opportunity to cut their losses.

142.    Defendants also incorrectly represented that the "CVR" or value of the liquidation of assets from the IKONICS reverse merger had $0 value in the share price.

143.    To add insult to injury, Plaintiffs agreed to buy their shares at $16.72, as advertised for a private placement valuation of $1.75billion, but post-closing the numbers provided by Defendants were completely off. Defendants claimed that the locked-in price of Plaintiffs' stock was significantly higher than $16.72, when the plain language of the contracts showed otherwise.

144.     By increasing the price per share, Defendants effectively tried by omission (or otherwise) to deprive Plaintiffs from owning thousands of additional shares to which they were totally entitled.

145.     Also, while Mr. Martorello questioned if the shares could be sold once the deal closed, Basile stated "volume won't be a problem" and even admitted that Defendants themselves "could have managed [a $2 million investment] size without liquidity issues".

146.     Yet, despite such bold statements, Summit kept Defendants' positions of $4 million hostage for close to two months. During those two critical months, the Martorellos' investment was in limbo. They gave $4 million in cash to Summit but did not receive their stock to further trade it or make key decisions.

147.     In an industry where decisions and transactions take place in a matter of minutes or even seconds, Summit's gross failure to advice the Martorellos that their $4 million would be frozen for such a prolonged time and *even after the merger was completed*, proved to be devastating.

148.     But, then again, Summit and Basile knew that the Martorellos would be very skeptical of the investment if they were informed that a prohibition to immediately transfer the shares was in place. Thus, they decided to withhold that information.

149.     Moreover, Summit holding and trading the shares as a block (another activity you engaged in without licensing), for Defendants' own benefit, impeded Plaintiffs from mitigating their exposure, by putting their shares into the open market immediately, as was always the advertised intention of the "overnight

double" that the trade was said to be.

150.    Consequently, very shortly after the transactions were consummated, the stock was quickly decimated, and the investments' value practically evaporated to less than 5% of the investment amount.

### Request for Declaratory Judgment

151.    The Declaratory Judgment Act provides, in its pertinent part, that "[i]n a case within its jurisdiction … any court of the United States, upon filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201.

152.    A declaratory judgment action is proper when the judgment will (a) serve a useful purpose in clarifying and settling legal relations at issue; and (b) provide relief from the uncertainty and controversy between the parties. *Aetna Casualty & Surety Co. v. Sunshine Corp.* 74 F.3d 685, 687 (6th Cir. 1996).

153.    In light of the events described above, there is a justiciable controversy regarding Defendants' conduct in serving as intermediaries to effect securities transactions, without being dully licensed for it and whether the Martorellos have the right to declare null said transactions and request full restitution of consideration ("contraprestaciones") exchanged between the parties.

### Plaintiffs' Claims

### First: Violation of PRUSA's § 861 and Restitution of monies paid

154.    Plaintiffs incorporate and re-allege all prior allegations of this FAC, as if fully set forth herein.

155.    Under PRUSA, it is *illegal* for any person to offer or enter into investment transactions, such as the transactions effected between Summit and the Martorellos, without being licensed as a broker-dealer or agent. 10 PR Laws Ann. § 861.

156.    Puerto Rico courts have not hesitated when called to enforce PRUSA's Section 861. In fact, as recent as May of 2022, the Puerto Rico Court of Appeals held, in a case analogous to the instant case, that a defendant's conduct in effecting securities transactions without a license is illegal, prompting the immediate restitution of the moneys invested by customers, such as the Martorellos. See *Bou Santiago v. JCAF Investment, Corp*, 2022 WL 2182415 (2022) (KLAN202200062) (PR Court of Appeals, Decided May 22, 2022).

157.    Likewise, a PRUSA violation for offering or selling securities without holding a broker dealer license constitutes a criminal offense, which additionally triggers the punitive damages provisions of Article 1538 of Puerto Rico's Civil Code. See *Pueblo v. Reyes Rivera*, 2012 WL 5196784 (2012 PR Court of Appeals).

158.    As such, the Investment Agreements between the parties are null and void, *ab initio*, having no binding and legal effect among them.

159.    Accordingly, the Martorellos have a right to seek, and hereby seek, a judgment declaring these agreements null and void and ordering the immediate restitution of the monies paid by them in exchange for the securities illegally sold by Defendants.

**Second: Defendants' Material Misstatements and Omissions**

160.     Plaintiffs incorporate and re-allege all prior allegations in this FAC, as if fully set forth herein.

161.     PRUSA's main purpose or objective is to protect the investors and the general public from fraudulent practices in the business and distribution of securities. *Mendez Moll v. AXA Equitable Life Ins. Co.*, 202 DPR 630, 636 (2019) (citing *Olivella Zalduondo v. Triple S*, 187 DPR 625, 636–637 (2013) and *PaineWebber, Inc. v. First Boston, Inc.*, 136 DPR 541, 543 (1994).

162.     PRUSA's Section 851 makes it unlawful for any person, in connection to the offer, sale or purchase of any securities, to directly or indirectly:

> (1) employ any device, scheme, or artifice to defraud;
> (2) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading;
> (3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person;
> (4) issue, circulate, or publish any material, printed or through electronic means, containing false representation of a material fact, or omitting information concerning a necessary material fact, so that the information which is issued, circulated or published, in the light of the circumstances in which it was issued, circulated or published, leads to an error, or
> (5) issue, circulate, or publish any material, or make any written statement, unless the name of the person who issues, circulates or publishes or makes the aforesaid, and the fact that it is that person who issues, circulates, publishes or makes the statement, is clearly indicated in that same communication.

163.     Defendants' acts and omissions, as detailed above, fall squarely within PRUSA's proscribed conduct.

164.     Moreover, PRUSA's Section 890 contemplates a private right of action to bring suits against any person who:

(1) Offers or sells a security in violation of § 861(a), […], or

(2) offers or sells a security by means of a false statement of a material fact or omitting to state a material fact needed to prevent that any statement made, in the light of the circumstances under which it was made, leads to misunderstanding (the buyer not knowing of the falsehood or omission), and does not suppport the burden of proof that he did not know, and in exercising reasonable prudency could not have known of the falsehood or omission, shall be liable to the person who buys the security, who may file suit to recover the price paid for the security, in addition to the interest at the rate applicable to judicial awards as provided by the regulations approved to such effects the Financing Board created by §§ 2001 et seq. of Title 7, starting on the date in which the payment, costs and reasonable Attorney's fees were made less the sum of any income received on, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon returning the security, less its price when the buyer disposed of it plus interest at the rate applicable to judicial awards as provided through regulations approved to such effects by the Financing Board created by §§ 2001 et seq. of Title 7, as of the date such security was disposed of.

165.    PRUSA's Section 890 contains a burden-shifting provision that Defendants must overcome in this case.

166.    Here, as alleged in detail above, Defendants made a series of material misrepresentations and omissions about the true state of affairs of TeraWulf's energy facilities and completely exaggerated the financial position of the company, by describing the investment as "slam dunk", with the "downside risk […] priced in".

167.    Likewise, they made incorrect statements about the purchase price of the stock and other key components of the investment, such as whether the company was issuing trading options, whether the investment could be freely sold after closing, and whether the company was simultaneously issuing debt, etcetera.

Had Defendants been transparent about these key elements of the transaction, Plaintiff would not have invested in the "overnight double" that Defendants touted TeraWulf to be.

168.     Defendants were fully aware that their statements were materially inaccurate. They also withheld information regarding the prohibition to immediately transfer the shares publicly. Thus, holding the stock hostage for months.

169.     Plaintiffs relied on such statements in good faith, which led them to suffer massive losses on their $4 million dollar investments.

170.     Accordingly, Plaintiffs request to be compensated for all the damages suffered as a result of Defendants' conduct, which at the present can be estimated in almost the totality of their $4 million investment, less any net proceeds from the partial sale of a small portion of the shares that Summit claims it sold on behalf of the RLM Trust to mitigate some of its losses.

171.     Plaintiffs also request compensation for all consequential damages suffered by them, including the fact that Mr. Martorello had to pass on a Texas-based transaction for $1,100,000, because his money was tied up with Summit. The Texas company was subsequently bought out by a competitor for a significant sum, which would have equated to an $8,700,000 profit for Mr. Martorello.

172.     Likewise, Mr. Martorello had to take an extra $4,000,000 in debt from a Dallas-based private credit fund at about a 19% interest rate.

173.     Plaintiffs are also entitled to seek and hereby seek all applicable legal interests, costs and Attorney's fees.

**Third: Defendants' contractual breaches and damages**

174.    Plaintiffs incorporate and re-allege all prior allegations in this FAC, as if fully set forth herein.

175.    PRUSA's Section 890 states, in no uncertain terms, that "[t]he rights and remedies provided by this chapter are **in addition to** any other rights or remedies that may exist at law…" Emphasis added.

176.    Accordingly, investors, such as Plaintiffs, are not limited by PRUSA's list of remedies. See *Mendez Moll v. AXA Equitable Life Ins. Co.*, 202 DPR 630 (2019)

177.    Mendez Moll's concurring opinion by Justices Pabón Charneco, Kolthoff Caraballo, Rivera García and Estrella Martínez recognizes the existence and validity of a cause of action for breach of contract, in cases where the seller of a financial product contractually agrees to comply with the statutes, rules and regulations of the securities industry.

178.    That is precisely what happened here, pursuant to the clear text of Sections 3 (Representations and Warranties) and 4 (Indemnification) of the Investment Agreements.

179.    As such, Plaintiffs can bring and do bring an action for breach of contract against Defendants for their failure to comply with the applicable (i) standards of professional conduct and duties toward their clients, (ii) financial responsibility requirements, (iii) recordkeeping requirements, and (iv) supervisory obligations.

180.    Among other things, Defendants breached their fiduciary duties

towards Plaintiffs by failing to recommend suitable investments to them, which were not aligned with their risk appetite and investment strategies.

181.    Additionally, Summit failed to adequately supervise and train Basile, to avoid his conduct described herein, particularly the over-aggressive sales practices that he displayed in describing the TeraWulf investment and his conduct in pressing Plaintiffs to invest in this quick "overnight double".

182.    Plaintiffs estimate the damages stemming from Defendants' breach of contract in a sum of no less than $4,000,000.

**Fourth: Action to enforce the Indemnification clause agreed by the parties**

183.    Plaintiffs incorporate and re-allege all prior allegations in this FAC, as if fully set forth herein.

184.    Plaintiffs are also entitled to bring a contractual action to enforce the broad terms of the Indemnification clause agreed by Defendants.

185.    Defendants expressly agreed to compensate Plaintiffs for any damage suffered by them even as a result of alleged omissions, alleged misrepresentations and alleged breaches; all of which have been described in detail in this Complaint.

186. This is a material and essential covenant agreed by the parties, which moved Plaintiffs to enter into the agreement.

187. Tellingly, the indemnification clause agreed by the parties covers "intra-party" conduct, specifically "any misrepresentation or untrue statement or alleged misrepresentation or untrue statement of a material fact **made by Summit** to the Covered Members". Emphasis added.

**Fifth: Action to enforce Basile's personal guarantee against losses**

188. Plaintiffs incorporate and re-allege all prior allegations in the FAC, as if set forth herein.

189. Basile guaranteed in writing to the Martorellos that he would cover them "against any losses".

190. He further promised that the "Basiles keep their word".

191. The terms of the guarantee are clear and were not subject to any conditions.

192. Plaintiffs' decision to go forward with the transaction at issue was in great part due to Basile's personal guarantee.

193. Such a guarantee constitutes a binding contract under Puerto Rico law, which Basile, his wife and the legal partnership between them must honor.

**Sixth: Punitive Damages**

194. Plaintiffs incorporate and re-allege all prior allegations in the FAC, as if set forth herein.

195. Article 1538 the 2020 Puerto Rico Civil Code, which applies here, given that Defendants' conduct took place on or about November 2021, contemplates the imposition of punitive damages, when the defendant's act or omission constitutes a crime or are performed in bad faith or with dolus.

196. Under PRUSA the offer or sale of securities without holding a broker dealer license constitutes a criminal offense, which further triggers Article 1538's punitive damages provisions, which Plaintiffs invoke herein and seek compensation in an amount equal to $8,000,000 for the losses suffered by them

in the failed investments in TeraWulf.

WHEREFORE, Plaintiffs respectfully requests that the Honorable Court: grant the instant Complaint entering a judgment (1) declaring the Investment Agreements null and void *ab initio* and ordering Summit and Basile to restitute the monies paid by Plaintiffs; (2) compensating all the damages suffered by Plaintiffs, estimated in no less than $4,000,000, plus all consequential damages specifically alleged above, as a result of Defendants' misrepresentations and omissions, including all applicable legal interests, costs and attorney's fees for Defendants' obstinate conduct and temerity; (3) adequately compensating Plaintiffs for Defendants' contractual breaches, as alleged in detail above, for a sum of no less than $4,000,000 and issue an Order to enforce the broad terms of the Indemnification clause agreed by Defendants; (4) enforcing the Basiles' personal guarantee against any losses suffered by the Martorellos; (5) awarding all punitive damages to which Defendants are entitled, for an amount not to exceed $8,000,000; plus (6) any other relief available at law or in equity.

**RESPECTFULLY SUBMITTED.**

In Guaynabo, Puerto Rico, this 11th day of April, 2023.

**H. LOPEZ LAW, LLC**

Metro Office Park
Building 11, Suite 105-A
Guaynabo, PR 00968
Tel: (787) 422-0243

***/s/Heriberto López-Guzmán***
Heriberto López-Guzmán
USDC-PR No. 224611
hlopez@hlopezlaw.com

**/s/Thomas Trebilcock-Horan**
Thomas Trebilcock-Horan, Esq.
USDC - PR No. 220514
Trebilcock, LLC
Metro Office Park, BDG 11, Suite 105-A
Guaynabo, P.R. 00968
Tel: (787) 399-1969
tt@trebilcockllc.com